
**SO ORDERED.**

**SIGNED this 5 day of October, 2021.**



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
FAYETTEVILLE DIVISION

| | |
|---|---|
| **In re:** | |
| | **Case No. 20-03404-5-JNC** |
| **TERRY LOCKLEAR LOWRY,** | **Chapter 7** |
|     Debtor | |

_____

| | |
|---|---|
| **APOLLO MEDFLIGHT, LLC,** | |
|     Plaintiff, | |
| | **Adversary Proceeding No.** |
| v. | **20-00127-5-JNC** |
| **TERRY LOCKLEAR LOWRY,** | |
|     Defendant. | |

**MEMORANDUM OPINION WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    A complaint in this adversary proceeding was filed on October 28, 2020, by Apollo Medflight, LLC's (plaintiff or "Apollo"), which was amended (Dkt. 26) with leave of the court on February 10, 2021. Pursuant to 11 U.S.C. § 523(a)(2), (4) and (6), Apollo seeks a judgment excepting the debt owed to it by Terry Locklear Lowry ("defendant" or "Lowry") from the general discharge granted her in associated chapter 7 bankruptcy proceeding 20-03404-5-JNC (Chapter 7 Dkt. 16). Ms. Lowry contests and defends against the nondischargeability assertions in her answer

filed November 2, 2020 (Dkt. 4) and amended answer of March 8, 2021 (Dkt. 36). She seeks confirmation that debt is dischargeable and has been discharged.

A bench trial was held on July 21, 2021 in Greenville, North Carolina, which was continued to and concluded on July 22, 2021 in Fayetteville, North Carolina. At the conclusion of the trial, the court took the matter under advisement. At the request of the parties, the court allowed the filing of post-trial briefs, which were subsequently timely filed by plaintiff on August 18, 2021 (Dkt. 76) and defendant on September 15, 2021 (Dkt. 77). The matter is now ripe for decision.

## JURISDICTION AND PARTIES

The court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), which this court may hear and determine. Dischargeability of a particular debt is specifically defined as a core proceeding in 28 U.S.C. § 157(b)(2)(I) and (c)(2). The parties consented to the court entering final judgment on all matters raised in the adversary proceeding. *See* Pretrial Order of July 21, 2021, Dkt. 74. The court has constitutional authority to enter final judgment in this adversary proceeding. *Wellness Int'l Network, Ltd., v Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1947 (2015).

## PROCEDURAL HISTORY

Apollo is a limited liability company, organized and existing under the laws of the State of Texas, and is authorized to transact business in the State of North Carolina. It provides air ambulance and "life flight" services in southeastern North Carolina. Ms. Lowry is a citizen and resident of Robeson County, North Carolina, which is located within this federal judicial district. She is neither a minor nor an incompetent person.

On October 15, 2020, Ms. Lowry filed a Voluntary Petition in the United States Bankruptcy Court for the Eastern District of North Carolina, Fayetteville Division, seeking relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"). (Stipulations from the Pretrial Order ¶ 8, Dkt. 74.)[1] On October 28, 2020, Plaintiff Apollo filed its original complaint for determination of dischargeability of debt. Defendant Lowry filed a motion to dismiss for failure to state a claim upon which relief may be granted (Dkt. 4) on November 2, 2020. A brief in support of the motion was filed on January 12, 2021 (Dkt. 21). Plaintiff filed a response in opposition on January 13, 2021 (Dkt 22). At the hearing held February 9, 2021, Apollo made an oral motion to amend its complaint. By order filed February 9, 2021, the motion to dismiss was denied, and plaintiff was allowed twenty-one days to file an amended complaint.

The amended complaint asserts that Apollo's unsecured claim against Ms. Lowry for $47,565.00 is not dischargeable on the following grounds: (1) Section 523(a)(2)(A), as money or property obtained by false pretenses, a false representation, or actual fraud; (2) Section 523(a)(4), due to fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; and (3) Section 523(a)(6), because of willful and malicious injury by the debtor to another entity. The allegations and conclusions are denied in the defendant's amended answer. A final pretrial conference was held by telephone on July 19, 2021, at which the parties stipulated to certain facts contained in the Final Pre-Trial Order.

At trial, the court heard live testimony from defendant Terry Lowry and her sister, Mary Locklear. By consent, the court received depositions read into the record and various exhibits into evidence, including three audio files of conversations with Blue Cross and Blue Shield of North Carolina ("BCBSNC") (Pl.'s Exs. 47, 48, 57); the deposition testimony of Adonna McFall[2] as the

---

[1] Stipulations from the Pretrial Order, Dkt. 74, shall be referenced herein as "Stipulation ¶ #."
[2] Ms. McFall is the Director of BCBSNC's Commercial and Medicare Appeals and Grievance Area.

Rule 30(b)(6) designee of BCBSNC; and the deposition testimony of Christine Price, the account person at Apollo who handled the Lowry account. Based upon the testimony of these witnesses (including the deposition testimony) and other evidence admitted at trial, and after considering the legal arguments of counsel, the court makes the following findings of facts and conclusions of law:

**FINDINGS OF FACT**

1.  On January 10, 2019, Lowry suffered several gunshot wounds while home at 67 Bovine Drive, Lumberton, North Carolina. She received initial medical treatment from Emergency Medical Services of Robeson County, North Carolina. (Stipulation ¶ 12, testimony of Ms. Lowry.)

2.  Shortly thereafter, Apollo received a request, from Robeson EMS, to transport Lowry by air ambulance helicopter to the Level One Trauma Center at New Hanover Regional Medical Center in Wilmington, North Carolina ("New Hanover Regional"). (Stipulation ¶ 13.)

3.  Joseph Cellucci, Apollo's flight paramedic, and Sarah Poldo, RN, an employee of New Hanover Regional, executed a Patient Consent and Assignment of Benefits for Ms. Lowry as her emergency health care provider. (Stipulation ¶ 14, testimony of Ms. Lowry.)

4.  Apollo proceeded to provide the air ambulance services and airlifted Ms. Lowry to New Hanover Regional for life-saving treatment. (Stipulation ¶ 15.)

5.  During this time, an insurance card was provided to Apollo indicating Ms. Lowry had coverage as Subscriber (# removed for privacy concerns) under a health insurance policy purchased by her and issued by BCBSNC. (Stipulation ¶ 16.)

6.  On January 15, 2019, Apollo submitted a medical services claim to BCBSNC for $47,565.00, relating to the January 10, 2019 life flight it provided for Ms. Lowry. (Stipulation ¶ 17.)

7.  On January 28, 2019, Apollo sent a letter and invoice (the "January 28 Letter") to Ms. Lowry's home address, where it believed that she received mail, asserting and noting its claim for

$47,565.00 for the air ambulance services provided for her as described above on January 10, 2019. (Stipulation ¶ 18; Deposition of Christine Price.)

8.     In the January 28 Letter, Apollo noted that it had made a claim to BCBSNC; informed BCBSNC of an assignment of health insurance benefits; and requested that BCBSNC pay Apollo directly; but that BCBSNC had informed Apollo that payment could be issued directly to Lowry. Apollo further noted, "This payment is for the services Apollo provided to you, and in payment of Apollo's claim to BCBSNC." (Stipulation ¶ 19; Deposition of Christine Price.)

9.     The January 28 Letter indicated if Ms. Lowry received a check from BCBSNC, she should forward payment directly to Apollo, stating: "Enclosed with this letter is a self-addressed, postage prepaid Priority Mail envelope; Apollo requests that, upon receipt of the check from BCBSNC, you endorse the check to Apollo, place it in the enclosed envelope, and place it with the nearest Post Office Mail Drop. Do not cash BCBSNC's check or deposit it in your personal account."  (Ex. 13 to Deposition of Christine Price.)

10.    Ms. Lowry testified no one resided at the Bovine Drive house for several months after the shooting, and that she did not receive or see the January 28 letter. She does not dispute that the address shown is that of her former home, but states that she was recuperating at her father's home on Ponk Street in Lumberton during this time, having been discharged by New Hanover Regional a few days after the shooting incident. She acknowledged that her son, a neighbor, and her sister, Ms. Locklear, would regularly check her mailbox and the house on Bovine Drive. If there was mail, ordinarily her son or sister would receive it from the neighbor, or pick it up directly from the mailbox, and take the mail to her father's house where she could review it. (Testimony of Ms. Lowry.)

11.    Ms. Lowry further admitted that for months after the shooting, she remained seriously injured and on strong pain medication, and that as a result was not able to concentrate on her business

5

affairs. She asked her sister to manage her business affairs during this time. (Testimony of Ms. Lowry; Testimony of Ms. Locklear.)

12. In late January and early February of 2019, Christine Price of Apollo attempted to call Ms. Lowry on her cell phone but was unsuccessful. Then, on February 11, 2019, Ms. Price received a return phone call from someone purporting to be Terry Lowry. The caller had a lengthy conversation with Ms. Price, detailing the events of the shooting, the events following thereafter (such as the flight), and her medical treatment and prognosis. The person asked Ms. Price to thank the airlift crew. The call came from 910-733-9*** (exact number hidden for privacy reasons).  (Price Dep. 30:19-31:25.)

13. Ms. Price testified the caller indicated she had received the January 28 Letter in the mail along with multiple other medical invoices. (Price Dep. 33:9-17). Ms. Price reviewed the January 28 Letter with the caller, specifically informing her that BCBSNC would likely mail the check directly to the caller (whom she believed to be Ms. Lowry) and asked that the caller be on the lookout for the BCBSNC check. (Price Dep. 34:11-18). After the explanation, Ms. Price recalled that the caller responded that she would endorse the back of that check and send it to Apollo. (Price Dep. 35: 16-23.)

14. On February 18, 2019, Ms. Price received another call from the same number and the same person purporting to be Ms. Lowry. The caller informed Ms. Price that the Terry Lowry on-line account with BCBSNC showed a "zero pay" despite the Apollo claim. (Price Dep. 37: 2-11.)  Ms. Price called BCBSNC later that same day and was informed the Apollo claim was being denied for "lack of medical necessity." (Price Dep. 38: 1-5.) Ms. Price then called back the same number and spoke with the woman purporting to be Ms. Lowry. Ms. Price informed her Apollo would resubmit the claim with additional records and asked her to be vigilant for a BCBSNC response. The caller purporting to be Ms. Lowry indicated that she too would call BCBSNC to relay the details of the incident. The caller did not contest, and in fact supported, the medical need for the life flight. (Price Dep. 39: 5-18.)

15.     On February 13, 2019, BCBSNC sent an initial Claim Review determination, rejecting Apollo's claim. (Stipulation ¶ 21.) On February 19, 2019, another call was received by Apollo from the person identifying herself as Terry Lowry to report a BCBSNC denial of the life flight claim a second time. Trista Gomez, another Apollo employee, handled this call. (Price Dep. 39:24—40:3.)

16.     Ms. Lowry admitted that throughout the first half of 2019, her sister Mary Locklear handled all communications with BCBSNC, medical providers such as Apollo and New Hanover Regional. Ms. Locklear's impersonation of her was necessary, Ms. Lowry contended, on the basis that at the time she was physically and mentally unable to manage her own affairs due to her injuries, medical condition, and pain medications. She told her Ms. Locklear to "handle what needed to be handled" during this time. She testified that while she does not remember talking about the Apollo bill specifically with her, she fully acknowledged that Ms. Locklear had "my consent to do whatever she needed to do" with respect to Apollo, BCBSNC, and other health care providers regarding bills. (Testimony of Ms. Lowry; Testimony of Ms. Locklear.)

17.     Ms. Locklear confirmed that Ms. Lowry's high school-age son asked her to help with the sorting medical bills and communicating with medical providers. She replied to him that she needed Ms. Lowry's express permission to do so. Consistent with Ms. Lowry's testimony, Ms. Locklear subsequently sought and specifically received permission and consent from Ms. Lowry to manage her medical business affairs including the Apollo and BCBSNC issue. (Testimony of Ms. Locklear.)

18.     On February 25, 2019, BCBSNC sent an Explanation of Benefits ("EOB") to Lowry at 19 Ponk Drive, Lumberton, NC 28360 ("the Ponk Drive Address"). (McFall Dep. 21, 22; Ex. 6.)

19.     On March 14, 2019, Ms. Price received a text from and then spoke on the phone with the person once again identifying herself as Ms. Lowry. (Price Dep. 43: 5-20.) Ms. Price informed her that she could appeal the BCBSNC denial of the Apollo claim. Ms. Price offered to pre-fill the appeal form for the caller but indicated she would need Ms. Lowry's original signature

7

on it.  (Price Dept. 44:21—45:9.) Ms. Price pre-filled the form and mailed it to Ms. Lowry with the bottom and signature part blank. (Price Dep. 44:10-25, Ex. 17.)  This envelope was received as it was returned to Apollo with the bottom part filled out and signed with what appeared to be Ms. Lowry's signature (Price Dep. 45: 1-2, Ex. 17.)

20. On March 21, 2019, BCBSNC's denial of Apollo's claim was appealed. On April 15, 2019, BCBSNC sent a letter to Lowry ("the April 15 Letter"), noting receipt of her appeal. (McFall Dep. 36; Ex. 14.)  During the appeal process, beginning February 11, 2019, someone identifying herself as Ms. Lowry contacted BCBSNC directly on a number of occasions by email, text, and telephone (McFall Dep. 48-49, 56-57, 60-61, Ex. 19.)  Each time the individual would affirmatively enter personal information and go through the BCBSNC identification verification process. (McFall Dep. 57-58.) The calls were recorded. In each of the three audio recordings produced by BCBSNC and admitted into evidence at trial, the caller identified herself as, or lead the caller recipient to believe, she was "Terry Lowry." (Ex. 47, 48, 57.)

21. On April 22, 2019, Musselwhite Branch & Grantham, a law firm located in Lumberton, North Carolina, sent a letter to Apollo as the attorney for Ms. Lowry, with an Authorization to Use or Disclose Health Information executed by Ms. Lowry seeking an itemized copy of the bill and office notes. (Stipulation ¶ 22.) Ms. Lowry testified she retained the Musselwhite law firm to pursue a personal injury claim relating to the shooting.

22. On or about April 24, 2019, as requested in the letter, Apollo mailed a copy of its invoice of $47,565.00 for the air ambulance services along with associated other documents requested to the Musselwhite law firm. A copy of the invoice was sent to Ms. Lowry at her home address of 68 Bovine Drive, Lumberton, NC  28360-7002. (Price Dep. 48: 5-10; Ex. 20.)

23. On each occasion, and in each email and text, Ms. Price believed she was speaking or communicating with Terry Lowry. Ms. Price testified that she never knowingly spoke with any other family members such as Ms. Locklear. (Price Dep. 50: 10-21.)

24. Ms. Locklear admitted under oath that she, rather than Ms. Lowry, called Apollo and BCBSNC in the noted phone calls and identified herself in each phone call as Terry Lowry. Ms. Locklear further admitted that she identified herself as Terry in numerous cell phone texts and emails to Apollo and BCBSNC, explaining that she knew no health provider would give her information if she did not identify herself as Terry Lowry. (Testimony of Ms. Locklear.)

25. In her trial testimony, Ms. Lowry identified the voice on the recorded calls to BSBCNC as that of her sister, Mary Locklear. She acknowledged that Ms. Locklear had her permission to represent herself as Ms. Lowry on the calls, stating that Ms. Locklear "did whatever she needed to do" because BCBSNC would not have talked to Ms. Locklear about Ms. Lowry's medical affairs otherwise due to medical privacy laws. (Testimony of Ms. Lowry.)

26. In her trial testimony, Ms. Locklear admitted that the voice on the audio recording (the second recording) was her own, and that in the call she affirmatively identified herself as Ms. Lowry. She also admitted that she signed Terry Lowry's name on the Appeal Form dated March 21, 2019 (Ex. 17). Ms. Locklear explained that she was the only family member helping Terry Lowry with resolving the medical bills and that Ms. Lowry was unable to function coherently during this time due to her extensive injuries, pain, and medication. Further, she explained Ms. Lowry had specifically asked her to handle all medical claim matters and that she was able to answer any identification verification questions because she knew "everything about her" because they are sisters. (Testimony of Ms. Locklear.)

27. No evidence was presented by the defendant to contest Ms. Price's belief that she was speaking with the defendant Ms. Lowry when Ms. Price was actually speaking with Ms.

9

Lowry's sister, Ms. Locklear. Also, Ms. Lowry did not contest, and Ms. Locklear admitted under oath, that Ms. Locklear acted with Ms. Lowry's permission and authority regarding all oral and written pertinent communications with Apollo and BCBSNC during this time.

28. On May 10, 2019, BCBSNC mailed a letter to Apollo approving insurance coverage for and payment of the Apollo life flight in the requested amount. (Stipulation ¶ 24.) After receiving it, on May 16, 2019, Ms. Price called Ms. Lowry to let her know the appeal was successful, that the claim had been approved, and a check would be sent. Ms. Locklear, again misrepresenting herself to be Ms. Lowry, informed Ms. Price of the Ponk Drive Address. She also said she notified BCBSNC of the address change. (Price Dep. 51: 9-25).

29. Ms. Locklear, continuing to pretend to be Ms. Lowry in these telephone conversations, told Ms. Price that she would forward the check to Apollo to satisfy her bill. Ms. Price reminded her to follow the instructions and forward the check to Apollo. (Price Dep. 53: 9-22.)

30. On May 17, 2019 Apollo mailed a second priority mail packet to Ms. Lowry at the Ponk Drive Address. According to the tracking information, the packet was delivered on May 20, 2019. (Price Dep. 54:2-8.) On May 20, 2019, BCBSNC sent to Lowry an Explanation of Benefits ("EOB") and a check for $47,565.00, made payable to Ms. Lowry (the "Insurance Proceeds Check"). (Stipulation ¶ 26.) Per BCBSNC policy, the EOB and the check would have been mailed at the same time in the same envelope. (McFall Dep. 38-41, Ex. 16.)

31. The EOB contains a section entitled "What Our Codes Mean" in which it provides that "BCBSNC makes payment directly to you for services render by non-participating providers. You are responsible for paying the non-participating providers bills." (Stipulation ¶ 27.)

32. As to receipt of the check for $47,565.00 from BCBSNC, Ms. Lowry testified at trial that her father called her and told her she had mail at the Ponk Drive Address. She sent her son to pick it up. When he brought it back, she testified that the only thing in the envelope was a check; she denied

that the envelope contained the EOB. She claims not to have seen the EOB until she was deposed, testifying that she "had no idea" what the check was for, knowing only that it was made payable to her and was from BCBSNC relating to her health insurance. (Testimony of Ms. Lowry.)

33. On May 21, 2019, Ms. Price attempted to call Ms. Lowry to inquire about the check and left her a message. No return call was made. On May 30, 2019, Ms. Price again attempted to call Ms. Lowry and left a message. When no return call was received, she tried a third time on June 3, 2019 and texted the phone number on June 4, 2019. She also sent another priority mail packet to the updated address provided by Ms. Lowry (or Ms. Locklear) (Price Dep. 54: 11 --55: 15.) On June 5, 2019, Apollo's representative sent an email to Ms. Lowry, noting BCBSNC had mailed the Insurance Proceeds Check to Lowry, Lowry's phone number was disconnected, and asking for contact information. All Ms. Price's attempts to contact Ms. Lowry after May 16, 2019 were unsuccessful and she did not hear from Ms. Lowry (or Ms. Locklear impersonating Ms. Lowry) in any form after the check was sent. (Price Dep. 56: 12-14.)

34. On May 29, 2019, Ms. Lowry received and endorsed the Insurance Proceeds Check and deposited the same in her personal bank account. She did not forward the Insurance Proceeds Check to Apollo or otherwise arrange to pay its invoice for the air ambulance services with other funds. (Stipulation ¶ 28.) She testified that the money from the Insurance Proceeds Check was subsequently used to pay her physical therapy, other medical bills, and general living expenses, and also the medical, living and later burial expenses for Ms. Lowry's elderly mother. (Testimony of Ms. Lowry).

35. From January 10, 2019 until at least May 29, 2019, Ms. Lowry had no personal telephone or email communications with BCBSNC or Apollo. Ms. Locklear, identifying herself as Ms. Lowry, was the only participant on the patient-side in telephone and email communications. From January 10, 2019 to at least May 20, 2019, Mary Locklear was attending to all of Ms. Lowry's medical billing issues and related communications.

36. Ms. Lowry specifically authorized Ms. Locklear to act on her behalf with respect to medical claim matters related to the shooting and injuries she suffered. She was unable to handle her own affairs from January 10, 2019 to the end of May 2019 due to her injuries, pain, and medicated state. When her sister discussed the denials by BCBSNC of several of her claims for medical bills with her, she testified that she was in so much pain, she did not "care if it never gets paid."

37. On July 22, 2019, the Musselwhite Firm withdrew from representation of Ms. Lowry. (Stipulation ¶ 29.) No personal injury claim related to the shooting has been pursued by Ms. Lowry.

38. The Apollo invoice remains unpaid and unsatisfied to date. On July 26, 2019, Apollo filed a Complaint with the Robeson County Clerk, commencing *Apollo Medflight, LLC v. Terry Lowry*, Robeson County File No. 19 CVS 2089 (the "Robeson County Action"). (Stipulation ¶ 30.) On November 12, 2019, Summary Judgment was entered in favor of Apollo, in the Civil Action, for the principal sum of $47,565.00, with interest thereon at eighteen (18) percent per annum from May 4, 2019 until paid in full, plus the costs of the Civil Action, including a reasonable attorney's fee. (Stipulation ¶ 31.)

## LEGAL ANALYSIS

### A. Burden of Proof and Res Judicata

Apollo bears the burden of proving the non-dischargeability of the debt by the preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Farouki v. Emirates Bank Int'l., Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994); *First National Bank v. Stanley (In Re Stanley)*, 66 F.3d 664, 667 n. 4 (4th Cir. 1995). Denying the dischargeability of a claim should "be interpreted narrowly." *In re Theonnes*, 536 B.R. 680, 697 (Bankr. D.S.C. 2015), *citing Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) ("exceptions to discharge 'should be confined to those plainly expressed'" (internal citation omitted)); *see also In re Causey*, 519 B.R. 144, 154 (Bankr. M.D.N.C. 2014) ("[A]llowing equitable exceptions to discharge under general common

law principles . . . would impermissibly widen the scope of these provisions of the Code and, in effect, swallow-up or render superfluous those exceptions enumerated in Section 523(a).").

To deny the discharge of a particular debt, the existence of the debt must first be established. Without a debt, the question of its discharge is irrelevant. *In re Campbell*, 545 B.R. 875, 885-86 (Bankr. M.D.N.C. 2016). The Amended Complaint alleges the filing of the Robeson County Action and the issuance of judgment. The validity and binding nature of these allegations were confirmed in the Stipulations of counsel and parties contained in its paragraphs 30 and 31 of the Pretrial Order, to wit:

> 30. On July 26, 2019, Apollo filed a Complaint with the Robeson County Clerk, captioned *Apollo Medflight, LLC v. Terry Lowry*, Robeson County File No. 19 CVS 2089 ("the Robeson County Action").
>
> 31. On November 12, 2019, Summary Judgment was entered in favor of Apollo, in the Civil Action, in the principal sum of $47,565.00, with interest at eighteen (18) percent per annum from May 4, 2019 until paid in full, plus the costs of the Civil Action, including a reasonable attorney's fee.

Rather belatedly, in her posttrial brief (Dkt. 77), the defendant attempts to challenge her liability on the Apollo debt, contending in retrospect that the medical professionals in the helicopter were not authorized to sign the Apollo air ambulance services contract on her behalf. The late assertion is made despite the two stipulations listed above, the medical necessities acknowledgment of the airlift in testimony at trial, and the receipt of, and retention of funds from, the Insurance Proceeds Check.

A bankruptcy court is not the court of appeals for a state court (here, the Robeson County Superior Court) that rendered a final judgment where that court held valid subject matter and personal jurisdiction. *Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 198 (4th Cir. 2000) (quoting *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983)) ("The *Rooker–Feldman* doctrine provides that a United States court "has no authority to review final judgments of a state

court in judicial proceedings.'".) *See also In re Burcam Capital II, LLC*, 539 B.R. 96, 100 (Bankr. E.D.N.C. 2015).

Ms. Lowry was indisposed at the time of the flight, and the question of authority may have been capable of challenge at one time. However, the existence of these facts and the validity of the claim amount and services performed for the underlying debt was established in the Robeson County Action long before her chapter 7 case was filed. When the petition was filed, that judgment was final and unchallengeable in state court as no appeal was timely taken.

This court is not the place to challenge the state court judgment. The defendant's late challenge to a fact already established and stipulated is meritless. Even if not stipulated, principles of *res judicata* require honor of the final state court decision. The defendant is barred from rechallenging the debt established in the Robeson County Action in this adversary proceeding.

**B. Agency Under State Law**

Ms. Lowry did not contest Apollo's contention that she expressly authorized her sister, Mary Locklear, to act as her agent as to all medical bills and dealings with insurance companies, including the Apollo claim that is the subject of this trial. "Agency arises when parties manifest consent that one shall act on behalf of the other and subject to his control." *Miller ex rel. Bailey v. Piedmont Steam Co.*, 137 N.C. App. 520, 524, 528 S.E.2d 923, 926 (2000), *citing Hayman v. Ramada Inn, Inc.,* 86 N.C.App. 274, 357 S.E.2d 394, *disc. review denied,* 320 N.C. 631, 360 S.E.2d 87 (1987).

Ms. Lowry, as the principal in the agency relationship, is responsible for all acts of her agent, Ms. Locklear, committed within the scope of the agency authority, including her direct dealings with and representations (and misrepresentations) to Apollo and BCBSNC. *Phillips v. Restaurant Mgmt. of Carolina, L.P.,* 146 N.C. App. 203, 215, 552 S.E.2d 686, 695 (2001), *citing Daniels v. Reel,* 133 N.C.App. 1, 10, 515 S.E.2d 22, 28, *disc. review denied,* 350 N.C. 827, 537 S.E.2d 817, 818 (1999).

As a general rule of the law of agency, a principal is charged with the knowledge of her agent. *Reinninger v. Prestige Fabricators, Inc.,* 136 N.C. App. 255, 262, 523 S.E.2d 720, 725 (1999), *citing* 3 Am Jur. 2d Agency § 281, at 784-85 (1986). Further, a principal is chargeable with and bound by notice given to the agent while the agent is acting within the scope of her authority and in reference to a matter over which her authority extends, even if the agent fails to inform the principal of the notice. *In re Withrow*, 93 B.R. 436, 438 (Bankr. W.D.N.C. 1988) *citing Norburn v. Mackie,* 262 N.C. 16, 136 S.E.2d 279 (1964).

Ms. Lowry admitted that she gave her sister, Mary Locklear, full authority to handle her medical bills as she was unable to handle her own affairs. Ms. Locklear, as Ms. Lowry's agent, then knowingly and intentionally (a) misrepresented her identity to Apollo and BCNSBC, (b) accepted the conditions of release of the check by BCBSNC such as the EOB, (c) induced the appeal when the claim was initially denied, and (d) actively made promised Apollo that she (impersonating Ms. Lowry) would endorse and forward the Insurance Proceeds Check to it upon receipt.

Regardless of whether Ms. Lowry received or retained actual knowledge of her agent's exact representations to Apollo regarding the $47,565 BCBSNC check, or whether she received and read the EOB, she is bound by the express representations and actions of Ms. Locklear as her agent. As the principal, she may not later hide behind oblivious ignorance of the agent's representations to harm a creditor. All relevant statements and knowledge of Ms. Locklear obtained within the scope of the agency is imputed to Ms. Lowry.

C. **Discharge Under Section 523(a)(2)(A)**

Bankruptcy Code Section 523(a)(2)(A) provides, in pertinent part, for an exception from discharge "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To establish

15

the nondischargeability of a debt under §523(a)(2)(A), the plaintiff must prove: "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages." *SG Homes Assocs., LP v. Marinucci*, 718 F.3d 327, 334 (4th Cir. 2013) *quoting Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 218 (4th Cir. 2007); *Gourdine v. Crews*, 405 Md. 722, 955 A.2d 769, 791 (Md. 2008); *see also Field v. Mans*, 516 U.S. 59, 69, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995) (explaining that "operative terms" of subsection (2)(A) are "common-law terms").

  Ms. Lowry, through her agent Ms. Locklear, with all statements and knowledge of Ms. Locklear in this matter imputed to her, falsely and deceitfully represented to Apollo and to BCBSNC that she was seeking to have the insurance claim paid so that she could endorse that check over to and use it to pay her medical bill with Apollo. Indeed, the deceitful scheme began with a fraudulent statement as to identity of the caller (Ms. Locklear instead of Ms. Lowry). Ms. Locklear stated under oath that she knew that unless she mispresented herself, she would not be able to obtain the medical billing and insurance information. After seeking physical receipt of the check by filing the appeal to BCBSNC, followed by several active misrepresentational promises to Apollo regarding a subsequent endorsement and forwarding of the check, next followed by a cessation of communications with Apollo, Ms. Lowry received the funds contained in the BCBSNC check designated for Apollo for medical services provided and deposited the check into her own bank account.

  Apollo employees reasonably believed at all pertinent times that they were dealing directly with Ms. Lowry. They justifiably relied on Ms. Locklear's assurances that the check would be forwarded to Apollo upon receipt. Apollo was injured when it was not paid the $47,565.00 due and owing to it from Ms. Lowry after false statements and misrepresentations were made on her

behalf. Rather than mere passivity, active measures were taken by Ms. Locklear (and hence Ms. Lowry as the principal) to appeal and obtain the check after BCBSNC initially denied the claim, and then to retain it. The actions of Ms. Lowry, fastened to the statements of Ms. Locklear, were deceitful and dishonest, leading to her receipt and retention of the funds under false pretenses. Therefore, the court finds the debt is non-dischargeable pursuant to §523(a)(2)(A).

**D. Discharge Under Section 523(a)(4)**

A debt may also be excepted under Bankruptcy Code Section 523(a)(4) for "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." "Section 523(a)(4), for instance, covers only debts for fraud while acting as a fiduciary, whereas §523(a)(2)(A) has no similar limitation." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1588 (2016). Plaintiff has not provided evidence of the existence of a fiduciary relationship under Section 523(a)(4). In the absence of a fiduciary relationship as a matter of law, such as an attorney-client or familial relationship, the mere existence of a debtor/creditor relationship, or even an implied but unwritten common law claim of trust, with nothing more, is insufficient to establish a fiduciary relationship for purposes of Section 523(a)(4). *In re Sorge*, 566 B.R. 369, 377 (Bankr. E.D.N.C. 2017). Apollo has not provided any evidence of an express trust. Therefore, plaintiff has not proven its claim for fraud or defalcation while acting in a fiduciary capacity.

Larceny does not require the existence of a fiduciary relationship. Under federal common law, larceny is the "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." *In re Coley*, 609 B.R. 298, 313 (Bankr. E.D.N.C. 2019), quoting *In re Langworthy*, 121 B.R. 903, 907-08 (Bankr. M.D. Fla. 1990); *see also* LARCENY, Black's Law Dictionary (11th ed. 2019). The facts of this case, even with the deceitful series of events recounted above, do not neatly fit the elements of larceny, as there has been no showing of an

initial unlawful taking of the funds. While defendant used false representations to retain the funds and improperly spent the money rather than hand it over, Apollo made no showing that it ever possessed the funds, and in fact additionally acknowledged it could not force BCBSNC to pay the check to Apollo directly.

Although Ms. Lowry had imputed knowledge from her agent, Ms. Locklear, sufficient to constitute actual fraud and false pretenses, Apollo did not present further evidence that Ms. Lowry's actions rose to the level of "felonious activity" as that term applies to larceny. Apollo did not show a concerted conspiracy or pre-existing plan to take the check proceeds directly from it. No proof beyond the unmindful lack of comprehension on the part of Ms. Lowry was made. Having not carried its burden, the debt is not excepted from discharge due to larceny pursuant to 11 U.S.C. § 523(a)(4).

### E. Discharge Under Section 523(a)(6)

A debt may also be non-dischargeable for willful and malicious injury. Section 523(a)(6) provides, in pertinent part, that: "(a) A discharge under Section 727, 1141, 1228(a), 1228(b) or 1328(b) does not discharge an individual debtor from any debt (4) for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

"The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 977, 140 L. Ed. 2d 90 (1998). *See also In re Muhs*, 923 F.3d 377, 385 (4th Cir.), *cert. denied sub nom. TKC Aerospace Inc. v. Muhs*, 140 S. Ct. 607, 205 L. Ed. 2d 387 (2019 ) ("The Supreme Court and this court have decided that a debt arising from an injury attributable to mere negligent or reckless conduct does not satisfy the "willful and malicious" requirement of (a)(6); in addition, it is not enough that the conduct underlying the injury was intentional. Rather, the debtor must have

engaged in such conduct with the actual intent to cause injury." *(citations omitted)*.) "To qualify as malicious, the debtor must have acted with substantial certainty that harm would result or with a subjective motive to cause harm." *In re Coley*, 609 B.R. 298, 311 (Bankr. E.D.N.C. 2019), *citing In re Cobham*, 528 B.R. 283 (Bankr. E.D.N.C. 2015).

While plaintiff carried its burden as to willfulness by a preponderance of the evidence, it failed to show defendant's actions were also malicious. The willfulness element in this case is met by imputing the representations and misrepresentations of Ms. Locklear as the agent to Ms. Lowrey. The defendant is deemed to know what her agent knows and has said, particularly here where the agent acts with unclean hands due to the active misrepresentation of identity. Ms. Lowry depositing and using the BCBS funds for her own expenses rather than sending the check to Apollo shows willfulness, but that action alone does not extend beyond willfulness. Given that the defendant was acting with imputed knowledge—rather than with any evidence or instructions to her agent, or as part of a conspiracy with her agent—of the misrepresentations, and nothing more, and taking into account her condition at the time, under the totality of the circumstances presented in this case, plaintiff has failed to show defendant's actions were willful and malicious. Given her condition at the time and the lack of evidence on the state of mind of the defendant beyond being bound by the statements and representations of Ms. Locklear as her agent, even with the knowledge imputed from her agent, Apollo made an insufficient evidentiary showing that Ms. Lowry's actions were willful and malicious as defined by case law interpreting the exception in section 523(a)(6).

Therefore, Apollo has not met its burden of proof on the necessary elements of its section 523(a)(6) claim as to the additional malicious intent. The dischargeability claim for violation of section 523(a)(6) fails.

## CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, the claim that the debt owed by her to Apollo in the amount of $47,565.00 is non-dischargeable under Section 523(a)(2) is granted, but the claims that the debt is non-dischargeable under Section 523(a)(4) and 523(a)(6) are denied. The prior state court judgment remains in full force, unaffected by Ms. Lowry's chapter 7 case 20-03403-5-JNC. A separate judgment stating that the identified debt is non-dischargeable is entered simultaneously herewith in this adversary proceeding.

**END OF DOCUMENT**